(No. 87-CC-0048▉

M. JAMIL HANIFI, Claimant, *v.* THE BOARD OF REGENTS OF THE REGENCY UNIVERSITIES SYSTEM OF THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 20, 1993.*
*Order filed January 21, 1994.*
*Order filed March 17, 1994.*
*Order filed May 12, 1994.*

M. JAMIL HANIFI, *pro se*, for Claimant.

GRIFFIN, WINNING, LINDNER, COHEN & BODEWES (GEORGE M. SHUR and R. MARK MIFFLIN, of counsel), for Respondent.

132

## OPINION

FREDERICK, J.

The Claimant, M. Jamil Hanifi, filed his amended verified complaint in the Court of Claims on November 17, 1986. Claimant alleged that the Respondent, Board of Regents of the Regency Universities System of the State of Illinois, breached the Claimant's contractual and due process rights to a hearing in relation to employment discharge proceedings after Claimant's resignation of his employment with the Respondent and that the resignation of the Claimant was coerced by Respondent and involuntary and, therefore, invalid.

The cause was tried by Commissioner Whipple, who was assigned to this case.

### The Facts

The Claimant, M. Jamil Hanifi, had been employed with Northern Illinois University since 1969. It is undisputed that the Claimant plagiarized his doctoral thesis, which he obtained from Southern Illinois University in 1969. In addition, Claimant later published the plagiarized material in a book. Included in the Claimant's book and doctoral thesis was plagiarized material from a book written by Mr. Manfred Halpern and material from an essay written by Professor Robert Bellah. Three of the nine substantive chapters of the Claimant's book were plagiarized. The plagiarized doctoral thesis and book were

used in conjunction with Claimant's application to obtain tenure on the faculty of Northern Illinois University.

Professor Robert Bellah first became aware of Claimant's plagiarism in 1976. Claimant testified that Professor Bellah wrote to him by letter of June 29, 1976. Claimant claims that he discussed this letter with Professor Ronald Provencher, the then chairman of the Department of Anthropology at Northern Illinois University. Mr. Hanifi claims that Professor Bellah accepted his apology and assurance that there would be no repetition of his plagiarism. Claimant also testified that Professor Provencher ultimately indicated that he did not like the way that Professor Bellah had handled the case and he tore up his copies of the letters from Professor Bellah and put them in the wastebasket.

Professor Provencher testified that he had been called by Professor Bellah in 1976 and that he had asked Professor Bellah to write a letter to Mr. Hanifi, detailing the plagiarism and to send Professor Provencher, as the chairman of the Department of Anthropology, a copy of this letter. Professor Provencher indicated that he never received the follow-up letter detailing the allegations from Professor Bellah and, therefore, the matter was dropped at that time. Professor Provencher denied that he ever told Mr. Hanifi that he did not approve of Professor Bellah's handling of this matter. Professor Provencher also denied that he tore up any letters from Professor Bellah.

The publisher for Mr. Manfred Halpern had first confronted Mr. Hanifi concerning the plagiarism of the Halpern material in 1977. At that time, Mr. Hanifi paid a financial settlement of $750 and apologized for his plagiarism of the Halpern book. Mr. Hanifi did not inform Southern Illinois University, where he had obtained his

doctoral degree, or Northern Illinois University, where he was then employed, of the Halpern plagiarism in 1977. In 1981, Southern Illinois University became aware of the Claimant's plagiarism of the Halpern book. The then acting dean of Southern Illinois University, Mr. John Jackson, confronted Mr. Hanifi with the charges of plagiarism of the Halpern book by letter dated January 16, 1981. Mr. Hanifi responded to Dean Jackson by admitting that he had plagiarized the Halpern book in a letter to Dean Jackson dated January 22, 1981. Acting on behalf of Southern Illinois University, Dean Jackson further inquired of Mr. Hanifi as to whether or not there had been any plagiarism in addition to the Halpern book. Mr. Hanifi responded, in writing, to Dean Jackson, assuring him that there was "No other plagiarism involved in the dissertation."

By letter dated April 24, 1981, Southern Illinois University formally advised Northern Illinois University of Mr. Hanifi's plagiarism of the Halpern book. At the time of the disclosure of the plagiarism to Northern Illinois University, Mr. Hanifi's application for the chairmanship of the Anthropology Department at Northern Illinois University was being considered. Mr. Hanifi met with the chairman of the department, Stanley Witkowski, who recommended that Mr. Hanifi withdraw his application for the chairmanship of the department. Mr. Hanifi testified that he met with chairman Witkowski on May 4, 1981, and was advised by Witkowski that the dean of Northern Illinois University wanted Mr. Hanifi to withdraw his application for the chairmanship of the Department of Anthropology. Chairman Witkowski denied that Dean Norris of Northern Illinois University had requested the withdrawal. Mr. Hanifi sent a letter to Dean Norris, withdrawing his application for the chairmanship of the Department of Anthropology. Dean Norris formally

acknowledged the fact that Mr. Hanifi had withdrawn from the candidacy for the chairmanship of the Department of Anthropology by letter dated May 7, 1981. Dean Norris testified that he had not solicited Mr. Hanifi's withdrawal from the candidacy for the chairmanship, nor had he discussed Mr. Hanifi's withdrawal with any other individuals involved prior to the Claimant's withdrawal.

Mr. Hanifi testified that he met with Dean Norris on May 8, 1981, and the dean told him at that time that his resignation from the chairmanship of the Department of Anthropology was sufficient discipline with reference to his admitted plagiarism. Dean Norris specifically denied that he ever told Mr. Hanifi that his withdrawal from the chairmanship candidacy was sufficient punishment for his admitted plagiarism. Dean Norris had not investigated the charges of plagiarism and, thus, had no opinion as to whether or not Mr. Hanifi should withdraw from the chairmanship prior to the time that Mr. Hanifi withdrew his candidacy.

John LaTourette, the current president of Northern Illinois University, who was the vice-president and provost of that university in 1981, acknowledged that plagiarism is "probably the most serious charge against a faculty member that one could imagine." The president of the university in 1981, William Monat, similarly acknowledged that plagiarism is "probably one of the greatest offenses that can occur in the academic community." Mr. Hanifi, himself, has written to others and admitted during his testimony that plagiarism involves "a complete lapse in professional judgment, moral sense and respect for academic ethics," "a most serious violation with dishonor, shame and guilt," "unethical conduct," "dishonorable and unprofessional conduct," and "dishonorable act and reprehensible and condemnable," "a violation of basic scholarly activity

and serious misconduct," "a despicable act and a serious mistake." Mr. Hanifi acknowledged that the plagiarism is not erasable.

After Mr. Hanifi's withdrawal from the candidacy for the chairmanship of the Department of Anthropology, Mr. Hanifi went out of town to Washington, D.C. While Mr. Hanifi was out of town, in accordance with the instructions of Dean Norris, Professor Donn Hart investigated and confirmed the allegations of plagiarism which had been included in Dean Jackson's letter from Southern Illinois University to Northern Illinois University. Upon receipt of this information, Dean Norris wrote to Mr. Hanifi, indicating that the two of them should meet right away.

In response to the letter from Dean Norris, Mr. Hanifi telephoned the dean from Washington, D.C. on June 13, 1981. During the course of the hearing, Mr. Hanifi testified that Dean Norris raised the issue of his resignation during this telephone conversation. The statement, however, is contrary to statements made during the prior deposition of Mr. Hanifi, during which he indicated that Dean Norris had not mentioned resignation during this telephone conversation. On cross-examination, Mr. Hanifi acknowledged that he had, himself, first raised this issue of resignation in his letter of January 22, 1981, to Dean Jackson at Southern Illinois University when the Halpern book plagiarism had first come to light. In this letter, Mr. Hanifi specifically acknowledged that he was prepared to accept the decision and consequences of Southern Illinois University and asked only that he be advised of the decision before it was made public so that he could "resign if need be * * * and return to Afghanistan." Dean Norris testified that Mr. Hanifi first raised the possibility of his resignation with him at their meeting held on July 7, 1981.

Following this telephone conversation with Dean Norris on June 13, 1981, and before Mr. Hanifi returned to Northern Illinois University from Washington, D.C., Mr. Hanifi spoke with a colleague of his, Professor Cecil Brown, concerning this matter. Mr. Hanifi testified that Professor Brown told him that he should resign for the sake of the department and that Southern Illinois University was looking to Northern Illinois University to take action and the Board was looking to Northern Illinois University to take action. Professor Brown acknowledged that he had recommended to Mr. Hanifi that he resign. However, Professor Brown specifically denied that he told Mr. Hanifi that Dean Norris, Southern Illinois University, or the Board of Regents wanted his resignation or wanted Northern Illinois University to take action against Mr. Hanifi.

Mr. Hanifi met with Dean Norris on July 7, 1981, upon Mr. Hanifi's return to Northern Illinois University from Washington, D.C. According to Mr. Hanifi, Dean Norris indicated during this meeting that he had two items for Mr. Hanifi. One was a resignation letter and the other was an envelope containing "the machinery to dismiss you." Mr. Hanifi testified that Dean Norris told him he could see what was in the envelope if he did not sign the resignation letter. Mr. Hanifi testified that Dean Norris told him that the Board was looking to secure Mr. Hanifi's resignation or to fire him and that Southern Illinois University was looking to Northern Illinois University to take action against Mr. Hanifi. Mr. Hanifi also testified that he was overwhelmed by the dean's statements and was absolutely intimidated. Mr. Hanifi testified that he did not want to resign, but he went ahead and signed the letter of resignation. Mr. Hanifi testified that he did not read the letter of resignation but he did indicate that he asked that the phrase "for personal reasons" be

inserted into the letter. Mr. Hanifi testified that he was not shown a letter to him from the provost, which detailed the charges of his plagiarism and which referred to Mr. Hanifi's rights under the university constitution and by-laws, including a summary of the evidence and witnesses against him and containing the recommendation of the provost that Mr. Hanifi be discharged for cause immediately.

Mr. Hanifi testified that he was not told of his right to a hearing at this meeting with Dean Norris on July 7, 1981, and that he was not aware of his right to a hearing notwithstanding his position of professor at Northern Illinois University and having been employed there since 1969. However, on cross-examination, Mr. Hanifi admitted that in a letter which he wrote on February 24, 1982, to Professor Carroll Riley at Southern Illinois University that Mr. Hanifi had acknowledged that Northern Illinois University had offered him the option of an open hearing which he declined because "it would have made public the stain on Southern Illinois University, my department here, and would have led quite likely to my immediate dismissal." The letter of resignation is a one-paragraph letter which simply states Mr. Hanifi resigns his position for personal reasons effective May 15, 1982. Mr. Hanifi testified that he was not aware that he would be allowed to teach the upcoming academic year when he signed the letter on July 7, 1981.

Dean Norris testified that he specifically read the letter from the provost to Mr. Hanifi, which detailed the charges of plagiarism, during this meeting between Mr. Hanifi and Dean Norris on July 7, 1981 and that he gave a copy of the letter to Mr. Hanifi at that time. This letter included reference to Mr. Hanifi's rights under the university constitution and by-laws. Dean Norris also had a copy of the constitution and by-laws available for Mr.

Hanifi. Dean Norris testified that Mr. Hanifi asked if the hearing would be secret and that Dean Norris indicated that the proceedings were confidential, but the fact that the hearing was going on would probably not be able to remain confidential. Mr. Hanifi indicated to Dean Norris that he was concerned about the impact of a public hearing on his family.

Dean Norris then asked Mr. Hanifi to sign a receipt for his copy of the charges detailed in the provost's letter. Mr. Hanifi then asked if there was any way that these proceedings could be avoided and Mr. Hanifi raised the possibility of his resignation. Dean Norris advised Mr. Hanifi that if he resigned from the university, the issue would be moot. Dean Norris testified that as a result of his conversation with Mr. Hanifi, the dean asked his secretary to prepare a letter of resignation, which Mr. Hanifi then signed. Dean Norris denied that the resignation letter had been typed prior to his meeting with Mr. Hanifi. Dean Norris indicated that the effective date of May 15, 1982, resulted from Mr. Hanifi's request. Mr. Hanifi's son graduated from high school in May of 1982. Dean Norris officially accepted the letter of resignation from Mr. Hanifi by letter dated July 10, 1981.

Dean Norris specifically denied the allegations of Mr. Hanifi with reference to comments made about Southern Illinois University and the Board of Regents. Dean Norris testified that neither the Board of Regents nor Southern Illinois University was requesting the resignation of Mr. Hanifi, nor had they requested Northern Illinois University to take action against Mr. Hanifi. Further, Dean Norris specifically testified that he had not told Mr. Hanifi that the Board of Regents or Southern Illinois University was requesting his resignation or was requesting that action be taken against him.

In accordance with the letter of resignation, Mr. Hanifi taught his regular course load the next 1981-1982 academic year. However, Mr. Hanifi testified that he was "in a daze" from July through the fall semester of 1981. In December, he met with the president of Northern Illinois University to review the procedures followed in his resignation and to inquire about pressure from the Board of Regents. By letter dated January 19, 1982, President William Monat of Northern Illinois University responded that he refused to review the resignation or to reverse the actions of the dean. Significantly, President Monat testified that "the seriousness of plagiarism is probably one of the greatest offenses that can occur in an academic community," and that it was his sense that Mr. Hanifi would have been discharged had he not resigned. This is true even though the charges brought related exclusively to Mr. Hanifi's plagiarism of the Halpern book. Dean Norris was not aware of Mr. Hanifi's plagiarism of Professor Bellah's work until three years after the resignation of Mr. Hanifi.

Mr. Hanifi did nothing further until April of 1982 when he went to see Dave Murray, the chairman of the Board of Regents at the time. Mr. Hanifi testified that Mr. Murray told him that he should not have resigned and that he had legitimate reasons to pursue a legal case against Dean Norris and Northern Illinois University. Mr. Hanifi also testified that Mr. Murray told him that he knew of a case of plagiarism in the Department of Foreign Language at Illinois State University where the individual continued to teach. Mr. Murray recalled the meeting differently. Mr. Murray testified that he had absolutely not told Mr. Hanifi that he thought Mr. Hanifi had legitimate reasons to file suit and that he would never, and did never, express any opinion of Mr. Hanifi's

lawsuit. Mr. Murray denied telling Mr. Hanifi that he should not have resigned and denied telling him that he thought Mr. Hanifi should pursue this matter in the courts. Instead, Mr. Murray's testimony was that he simply told Mr. Hanifi that he should see an attorney and do whatever the attorney said and he referred Mr. Hanifi to an attorney. Mr. Murray denied advising Mr. Hanifi that an Illinois State University professor accused of plagiarism continued to teach and, in fact, testified that it was his recollection that the Illinois State University professor accused of plagiarism was either terminated or resigned.

## The Law

Claimant has the burden of proving by a preponderance of the evidence that he had contractual and/or due process rights to a hearing prior to discharge by the Board of Regents of the Regency University System of the State of Illinois after his resignation was accepted by the Respondent. The Claimant must also prove that such contractual or due process rights were violated by Respondent and that he suffered damages thereby. For the reason that Claimant did resign, a threshold question concerning the voluntariness of the resignation must be addressed prior to considering any other issue. If the Claimant's resignation was voluntary and not coerced, he cannot recover and we do not reach the issues as to contractual or procedural rights, a violation of those rights and damages.

From the lack of authorities cited in the briefs and our research, we find this particular factual situation to be one of first impression in the Illinois Court of Claims. However, the threshold issue we must first determine has been litigated in the civil courts and is an issue of voluntariness and coercion or lack thereof that can be determined from the evidence presented and from determining the credibility of the witnesses, including the Claimant.

There is no question from the evidence that Claimant resigned. If the resignation was voluntary by this public employee then it was effective and binding for all time when received by Respondent. (*Weber v. Board of Fire and Police Commissioners* (1990), 204 Ill. App. 3d 358; *Stearns v. Board of Fire and Police Commissioners* (1978), 59 Ill. App. 3d 569.) "When one voluntarily submits a resignation, he thereby divests himself of any legal interest in his former employment." *Whitaker v. Pierce* (1976), 44 Ill. App. 3d 148.

We recognize that a resignation can be involuntarily coerced and therefore legally equivalent to a discharge. When a person is severed from his employment by coercion, the severance is effected by the supervisor and not by the will of the employee. A person forced to resign is in reality discharged and not a person who exercises his own will to end his employment voluntarily. (*Piper v. Board of Trustees* (1981), 99 Ill. App. 3d 752.) The issue is whether Claimant's judgment was merely influenced or whether his mind was so dominated by Respondent as to prevent the exercise of an independent judgment. (*Piper, supra* at 758.) If an individual's will was overborne or if his resignation was not the product of a rational intellect and free will, then his resignation is a discharge. The question of whether a resignation is voluntary depends on the circumstances under which it is made.

From a thorough review of the evidence in this case, we find that the Claimant has failed to prove that his resignation was involuntary, coerced or the product of duress. The testimony of Claimant and Respondent's witnesses is at loggerheads. To believe Claimant's testimony as to coercion, duress and involuntariness, we would have to disbelieve numerous other witnesses and find some grand conspiracy among the top officials at Northern Illi-

nois University to injure Claimant, which would include mass perjury. Claimant has presented no compelling evidence to corroborate his testimony and therefore in light of the credible testimony disputing his claim, we find his testimony incredible. Frankly, we do not believe this admitted plagiarizer when he claims his will was overcome and he did not know what he was doing.

The Claimant has failed to pass the threshold question. He has failed to prove by a preponderance of the evidence that his resignation was not voluntary. Claimant made a voluntary and knowing resignation when faced in his mind with the options of seeking a hearing or resigning. Claimant alone made the choice to resign. The Respondent did not coerce the Claimant into resigning. Once Claimant voluntarily resigned, he had no right to a hearing and may not complain of an alleged illegal discharge.

For the foregoing reasons, it is the order of the Court that this claim is hereby denied.

## ORDER

FREDERICK, J.

This cause coming on the Claimant's motion for reconsideration, and the objection thereto, and the Court having reviewed the pleadings and testimony, and the Court being fully advised in the premises.

Wherefore, it is ordered that the motion for reconsideration is denied.

## ORDER

FREDERICK, J.

This cause coming on the Claimant's request to reopen and remove Claimant's attorney, Respondent's

objection to request for extension of time, and Claimant's objection to the objection to request for extension of time.

Wherefore, the Court finds:

1. That on September 20, 1993, the Court rendered an opinion denying Claimant's claim.

2. That the opinion was signed by four judges of the Court of Claims.

3. That the Commissioner assigned to the case did not write the opinion.

4. That the opinion indicated that Claimant had failed to meet his burden of proof. Issues of credibility were resolved adversely to Claimant in great part leading to the opinion of the Court.

5. That on January 21, 1994, the Court denied Claimant's petition for rehearing. In ruling on the petition for rehearing, the Court reviewed the entire court file and transcripts and the determination of credibility and findings of fact and findings of law. The Court believed the opinion was properly entered, was properly based on the evidence and law, and the Court did not change its opinion. The petition was denied.

6. That pursuant to sections 790.220 and 790.230 of the Court of Claims Regulations (74 Ill. Adm. Code 790), the Claimant has requested a rehearing and same has been denied.

7. That the regulations state, "Neither the claimant, nor the respondent, shall be permitted to file more than one application or petition for rehearing." Section 79.230.

8. That the *pro se* request to reopen filed February 14, 1994, is an impermissible attempt to seek a rehearing a second time.

9. That Claimant's objection to request for extension of time is not well taken. This Court ruled on the evidence. This Court did not consider in any way Claimant's race, creed or culture. The Court ruled based solely on the evidence and the law.

10. That Claimant filed his claim, presented his case at trial, and did not obtain the result he had hoped for. He is not entitled to a second trial.

Therefore, it is ordered:

A. That Claimant's request to reopen is denied.

B. That the motion for extension of time is denied.

## ORDER

FREDERICK, J.

This cause coming on for hearing on Claimant's petition for a rehearing filed March 18, 1994, and Claimant's revised petition for a rehearing filed March 28, 1994, and the Court having reviewed the pleadings, and the Court being fully advised in the premises, wherefore, the Court finds:

1. That on January 21, 1994, the Court denied Claimant's first petition for rehearing.

2. That pursuant to sections 790.220 and 790.230 of the Court of Claims Regulations (74 Ill. Adm. Code 790), the Claimant has previously requested a rehearing and the request has been denied.

3. That the regulations state, "Neither the claimant nor the respondent, shall be permitted to file more than one application or petition for rehearing." Section 790.230.

4. That the March 14, 1994, and March 28, 1994, petition for rehearing and revised petition for rehearing

are an impermissible attempt to seek a third and fourth rehearing. (See order entered March 17, 1994, previously denying the second request for rehearing.)

5. That there must be finality to cases and the Court's prior opinion is final denying Claimant's claim for the reasons stated therein.

Therefore, it is ordered that Claimant's petition for a rehearing filed March 18, 1994, and the revised Claimant's petition for a rehearing filed March 28, 1994, are denied.